IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-20933
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL J. PETROSKI, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Texas
(CR H 96-199)
_____
November 19, 1997

Before JOLLY, SMITH, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

Daniel Petroski, an attorney representing a plaintiff in a
civil trial in federal district court, was held in criminal
contempt of court because he was found to have wilfully violated an
in limine order of the court forbidding the introduction of certain
evidence. He spent one night in jail. He now appeals the contempt
order. Because we hold that the evidence fails to establish an
element of Petroski's guilt of the offense beyond a reasonable

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

doubt, that is, that the in limine order was reasonably specific, we reverse the judgment of criminal contempt.

## I

Petroski represented Melva Campbell, the plaintiff in a Texas wrongful death action. The district court bifurcated the trial into a liability/compensatory damages phase and a punitive damages phase. The court also granted the defendants' motion in limine to preclude the introduction of evidence relating to their "financial status" during the liability phase of the trial. From the bench, the court orally ruled "I don't think we need to talk about the financial status of the defendants [in the liability phase of the trial]. That's the whole point of bifurcation." Two days later, the court entered a written order that provided "Plaintiff is ORDERED not to present any testimony or otherwise introduce any evidence regarding the financial status of the defendant."

A crucial issue in the trial was whether the deceased, Tom Campbell, was an employee of the defendant Keystone Aerial Surveys ("Keystone") or an independent contractor at the time of his death. If he were an employee of Keystone, the negligence action would be barred by the workers compensation statute. In contrast, if he

were serving as an independent contractor, the wrongful death action could provide a vehicle for recovery.

One of the arguments Petroski advanced in relation to this contested matter was that Keystone, in its records, had treated Campbell as an independent contractor. For example, Keystone did not fill out any W-4 tax forms for Campbell and withheld no taxes from Campbell's paycheck as required by law for employees. Keystone also did not require Campbell to fill out time sheets, a practice it normally imposed upon its employees. To explain the discrepancy in its record-keeping, Keystone attempted to portray itself as a small operation, with informal record-keeping procedures. Presumably, Keystone wanted the jury to conclude that the incriminating discrepancies in its record-keeping were only the result of oversight.

Petroski set out to rebut this suggestion and to demonstrate that Keystone was not a small and unsophisticated business. He called Mallinckrodt, Keystone's president, to the stand as an adverse witness, and the following exchange led to Petroski's contempt citation:

> Petroski: You have heard [Keystone's counsel] Mr. Rose describe Keystone . . . as kind of a mom and pop shop, do you recall Mr. Rose describing Keystone . . . like that?
>
> Mallinckrodt: Yes.
>
> Q: Do you agree with that description?

A:   Yes, I sure do.

Q:   Where Mary Potter [who kept Keystone's records] is kind of shuffling papers, she's got all these hats, these 20 hats to wear?

A:   She wears a lot of hats, I give her a lot of credit.

Q:   You have got, what, nine, ten aircraft?

A:   Nine.

. . .

Q:   Okay.  You've got about 30 to 35 employees?

A:   I think it's probably closer to 30 now. Things aren't quite that good.

Q:   You are the president of Keystone?

A:   Yes.

. . .

Q:   Well, then, sir, you ought to know that between Keystone and Airmag, that they have an annual payroll of over $1.5 million, did you know that?

The district court upheld Keystone's counsel's objection and denied Petroski's two requests to approach the bench.

At the day's conclusion, the court ordered Petroski to turn all further questioning of Mallinckrodt over to his co-counsel. The next morning, the judge issued the certificate of criminal contempt for violation of its order that the plaintiff not introduce evidence of the defendants' "financial status."  After the jury returned its verdict, the court ordered Petroski taken

4

into custody and he served the remainder of his twenty-four hour sentence.[1]  He now appeals the contempt order.

II

A

The district court summarily punished Petroski for criminal contempt pursuant to Rule 42(a) for "knowingly, willfully, and contemptuously" violating a court order and sentenced him to twenty-four hours in jail.  Rule 42(a) provides that

> A criminal contempt may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court.  The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

Fed.R.Crim.P.42(a).  The statutory authority under which the district court proceeded when it convicted Petroski of criminal contempt provides that

> A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as --
>      (1)  Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>      (2)  Misbehavior of any of its officers in their official transactions;
>      (3)  Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

---

[1]Petroski served part of his sentence prior to the submission of the civil case to the jury.

5

18 U.S.C. § 401.  Specifically, the district court convicted Petroski under subsection three--violation of a court order.

B

A conviction for criminal contempt under 18 U.S.C. § 401(3) requires proof beyond a reasonable doubt of (1) a reasonably specific order; (2) violation of the order; and (3) the willful intent to violate the order.  United States v. Landerman, 109 F.3d 1053, 1068 (5th Cir.), modified in part on other grounds, 116 F.3d 119 (5th Cir. 1997); United States v. West, 21 F.3d 607, 608 (5th Cir. 1994); Matter of Hipp, Inc., 5 F.3d 109, 112 (5th Cir. 1993); Cooper v. Texaco, Inc., 961 F.2d 71, 72 n.3 (5th Cir. 1992); United States v. Columbia Broadcasting Sys., Inc., 497 F.2d 107, 109 (5th Cir. 1974) (noting "although the court's verbal orders in this [criminal] contempt proceeding must meet the test of reasonable certainty, . . . a trier of fact must find no reasonable doubt as to their meeting that test.").  Such a conviction may not be upheld unless the order is clear and unambiguous.  Cooper, 961 F.2d at 72. "Any ambiguity must be resolved in favor of the defendant."  Id. Furthermore, a factual inquiry into the reasonableness of the order's specificity  must be conducted within the context in which the order was issued.  Matter of Hipp, 5 F.3d at 112; United States v. Revie, 834 F.2d 1198, 1201-02 (5th Cir. 1987), cert. denied, 487 U.S. 1205, 108 S.Ct. 2845 (1988); United States v. Turner, 812 F.2d

6

1552, 1565 (11th Cir. 1987) (noting clarity of order must be evaluated under reasonableness standard considering not only context in which order was entered but also audience to which it was addressed); cf. United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997) (reviewing specificity of court order de novo under sufficiency of the evidence rationale). Petroski contends that the district court's order excluding evidence regarding the defendants' "financial status" was not reasonably specific. He further contends that he did not violate the court's order, and, should we hold that he did violate the order, he argues that he did not do so with willful intent. The government argues that the evidence supports a finding that the court's in limine order was reasonably specific and that Petroski willfully violated it.

III

The question we must initially decide is whether the evidence established the first element necessary for a conviction of criminal contempt--that being a reasonably specific order. We review deferentially the district court's findings of facts.[2] Nevertheless, our cases make absolutely clear that the ultimate finding of criminal contempt is reviewed to determine whether--with

---

[2]United States v. Revie, 834 F.2d 1198, 1202 (5th Cir. 1987).

7

respect to each element of the offense--guilt has been established **beyond a reasonable doubt**. <u>Matter of Hipp, Inc.</u>, 5 F.3d 109, 112 (5th Cir. 1993); <u>see also</u> <u>United States v. Collazo</u>, 117 F.3d 793, 795 (5th Cir. 1997) (noting criminal conviction in bench trial will be affirmed "if there is any substantial evidence to support it and if the evidence is sufficient to justify the trial judge, as the trier of fact, in concluding beyond a reasonable doubt that the defendant was guilty."); <u>United States v. Laughlin</u>, 804 F.2d 1336, 1339 (5th Cir. 1986) (noting court reviewing sufficiency of the evidence in a criminal bench trial must ascertain "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

In its written decree, the district court ordered the plaintiff "not to present any testimony or otherwise introduce any evidence regarding the financial status of the Defendant." Petroski maintains that the term "financial status" is ambiguous and, therefore, the order did not unambiguously prohibit the introduction of payroll information. We turn to examine this contention.

Courts have historically used the term "financial status" loosely, sometimes equating it with "net worth" and other times lending it a broader definition. <u>E.g.</u>, <u>compare</u> <u>United States v.</u>

<u>Deutsch</u>, 599 F.2d 46, 48 (5th Cir. 1979)(using "financial status" to mean net worth); <u>United States v. Helton</u>, 975 F.2d 430, 432 (7th Cir. 1992) (same); <u>Arceneaux v. Merrill Lynch</u>, 767 F.2d 1498, 1502 (11th Cir. 1985) (same) <u>with</u> <u>Ross v. Black & Decker, Inc.</u>, 977 F.2d 1178, 1189 (7th Cir. 1992) (treating "financial status" as including both net worth and sales profits); <u>United States v. Fukushima</u>, 933 F.2d 1016 (9th Cir. May 16, 1991) (unpublished) (treating "financial status" as including both net worth and cash flow). The failure of the courts to agree on a precise definition of a term may be treated as significant evidence that generally the term is ambiguous.

This reasoning is especially apt, as here, opposing sides to a suit appear to share the same misinterpretation of the term. Keystone apparently also misunderstood "financial status" not to include payroll information. Before the evidence was introduced by Petroski, Keystone had already introduced two exhibits that revealed such information: Exhibit 42 shows that Keystone paid over $1 million in wages, and exhibit 43 reveals that Air Mag, a subsidiary of Keystone, paid over $500,000 in wages. Thus, Keystone earlier had introduced evidence that "between Keystone and Air Mag [there was] an annual payroll of over $1.5 million"--the identical information that Petroski was held in contempt for introducing. Although the district court's order forbade only the

9

plaintiff from introducing evidence of the defendants' financial status, the order was issued at the urging of Keystone's counsel. It was surely implicit that Keystone would not be allowed to introduce that which it sought to prevent the plaintiff from introducing.

The specificity of the order must also be viewed in the context within which it was issued. In its certificate of criminal contempt, the district court related its actions preceding the issuance of the order prohibiting the plaintiff from introducing evidence of the defendants' financial status. The court began by noting that it had bifurcated the trial into liability and damages phases, with introduction of evidence pertaining to punitive damages to be limited to the second phase in accordance with Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 30 (Tex. 1994). In stating its reasoning underlying bifurcation, the court quoted Texas law, saying that "evidence of a defendant's net worth, which is generally relevant only to the amount of punitive damages, by highlighting the relative wealth of a defendant, has a very real potential for prejudicing the jury's determination of other disputed issues in a tort case." (Emphasis added). The court then noted that during trial it had ruled orally that the plaintiff was not to present any evidence of the defendants' financial status.

This ruling had been followed two days later with a written order to the same effect.

The district court thus linked its order forbidding financial status evidence with its order bifurcating the trial. As argued by Petroski, and indeed as acknowledged by the district court in its certificate of criminal contempt, the purpose of bifurcation is to prevent the introduction of net worth of a company until the plaintiff demonstrates the relevancy of such evidence by proving the propriety of submitting the issue of punitive damages to the jury. Moriel, 879 S.W.2d at 30. Additionally, the district court responded to Petroski's motion for reconsideration of the contempt citation by stating that Petroski elicited payroll information "not because he wanted to show the jury that it was not a Mom-and-Pop operation . . . but because he was mad at me . . . [h]e saw this as a great opportunity to just completely crack open the egg having to do with net worth of the company." (Emphasis added). In short, it appears that even the district court associated the term "financial status" interchangeably with the term "net worth."

In sum, we are ineluctably led to the conclusion that the evidence relating to the specificity of the order is insufficient to permit a finding of criminal contempt beyond a reasonable

11

doubt.[3]  The term "financial status," as employed in the district

[3]The dissent argues that three instances in the record demonstrate Petroski's understanding that "financial status" included payroll information.  The dissent first quotes the plaintiffs' response to the defendants' pretrial motion in limine to exclude evidence of their financial status.  The defendants' motion was framed within the context of the trial bifurcation.  In a written response, the plaintiffs said:

> If, on the other hand, Defendants are continuing to contest liability, then Plaintiffs will not introduce evidence concerning Defendants' financial status until first presenting evidence of their gross negligence subject to this exception:  The salaries paid to the officers of the various companies for the "work" performed by these people are relevant to the issues in this case.  Such evidence will be presented to the jury and should not be included in the scope of this request by the Defendants.

The second instance occurred before trial in arguments relating to the same motion in limine:

> Petroski:  Anyway the next one, Judge, has to do with the financial status of the defendants.  I mean, we are not going to stand up here on direct and talk with the assets of the company.  We may talk about airplanes, receivables, payroll, or something like that, but we are not going to talk about assets.  That's not part of what our case is about.
>
> Mr. Rose: We filed a motion to bifurcate.
>
> The Court: I think I granted that, didn't I?
>
> Petroski: Yes.
>
> * * * *
>
> The Court: Let's talk about that later.  I don't think we need to talk about the financial status of the defendants.  That's the whole point of bifurcation.

The written response and these remarks, and the context within

12

court's order, was an ambiguous term--not a reasonably specific term.  We reach this conclusion because of the inherent ambiguity in the term "financial status" as reflected in the cases, the context within which the order was issued in relation to the bifurcation order, the district court's apparent use of the term "financial status" interchangeably with the term "net worth," and the context in which the allegedly forbidden evidence was elicited as we have detailed above.  Petroski's criminal contempt conviction is therefore REVERSED.[4]

which they occurred, demonstrate Petroski's understanding of "financial status" as the term related to the bifurcation order. In each instance, he pointed out his intention to introduce payroll evidence as relevant to the liability issue--not as evidence of the defendants' financial status in the bifurcation context.  The court did not disabuse him of his understanding.  Indeed, it is arguable that the court's reference to financial status and bifurcation reinforced Petroski's understanding that the court was speaking of assets and net worth--subjects relevant to damages.

The third instance--Petroski's agreement to white-out certain financial information in documents he wished to admit as evidence-- similarly fails to withstand scrutiny as it occurred in the context of an unrelated issue.  The financial information was personal payroll data of individuals employed by the defendants.  Such personal data was irrelevant to the issue of liability that Petroski was attempting to prove with the documents at that time; nor did the defense object to the financial information on the basis that it violated the in limine order against the admission of evidence of financial status.

[4]The reversal of the criminal contempt conviction should not be construed as condonation of Petroski's behavior.  The record demonstrates that at another point in the trial Petroski repeatedly ignored the trial court's rulings excluding certain evidence and persisted in the same line of questioning after being ordered by the trial court to discontinue.  Although the judge acted at all times with proper judicial restraint, we can well understand why

13

The appellee's motion to dismiss the appeal is DENIED. The appellee's alternative motion to supplement the record is GRANTED. The appellee's alternative motion to take judicial notice is DENIED.

For the foregoing reasons, the judgment of the district court is

R E V E R S E D.

JERRY E. SMITH, Circuit Judge, dissenting:

The majority seriously misapplies both our standard of review and the evidence to which that standard is to be applied. Accordingly, I respectfully dissent.

A.

The majority decides this case on the ground that the district court's order was not reasonably specific beyond a reasonable doubt. The majority gives lip service to our deferential standard of review but does not apply it properly to the facts of this case.

Most circuits are quite generous in the deference given to the fact finder in reviewing contempt orders for reasonable

_____

Petroski's conduct ultimately tested her patience. Petroski's actions may have fully justified a reprimand or perhaps civil contempt on other grounds, but the evidence does not support the judgment of conviction for criminal contempt for the reasons we have noted.

specificity.  The Eleventh Circuit, for example, requires only that there be substantial evidence to support the district court's finding of specificity.  *See United States v. Turner (In re Moore)*, 812 F.2d 1552, 1565 (11th Cir. 1987).  The Second Circuit agrees and "view[s] the evidence of the orders' specificity in a light most favorable to the government."  *United States v. Cutler*, 58 F.3d 825, 835 (2d Cir. 1995).  *Accord United States v. NYNEX Corp.*, 8 F.3d 52, 55 (D.C. Cir. 1993).

As the majority acknowledges, the law of this circuit is reflected in *United States v. Revie*, 834 F.2d 1198 (5th Cir. 1987). There, we cited *Turner* and applied a clear error standard to the district court's finding of reasonable specificity.  *Id.* at 1202. *Accord Wright v. Nichols*, 80 F.3d 1248, 1250 (8th Cir. 1996).

B.

The majority correctly states that "the specificity of the order must [] be viewed in the context within which it was issued." The record in this case plainly demonstrates that, prior to the order's issuance, Petroski had indicated that he understood "financial status" to include payroll data.

When the defendants first made their motion to exclude evidence of their financial status, Petroski responded as follows:

15

. . . Plaintiffs will not introduce evidence concerning Defendants' financial status until first presenting evidence of their gross negligence subject to this exception: The salaries paid to the officers of the various companies for the "work" performed by these people are relevant to the issues in this case. Such evidence will be presented to the jury and should not be included in the scope of this request by the Defendants.

Again, this pleading unequivocally shows that Petroski considered payroll information to be a part of financial status and that he therefore found it necessary to request a specific exception to the order *in limine*.

On the eve of trial, the district court addressed this dispute. Again, Petroski urged an exception to "financial status" for "airplanes, receivables, payroll, or something like that." The court responded by granting the motion *in limine* and, later, issued the subject written order directing the *plaintiff* "not to present any testimony or otherwise introduce any evidence regarding the financial status of the Defendant."

This understanding of "financial status" as including payroll information continued into the trial. In its opinion, the majority grants the government's motion to supplement the appellate record. One newly-added portion of the record shows that when Petroski tried to introduce certain State of Pennsylvania tax records containing payroll information, Defendants' counsel stated, on the record, that "I already told him [Petroski] my only objection is

16

the financial information.  I don't care about these lists.  He's got payroll information which I think is inappropriate.  I asked him simply to white it out."  Petroski then agreed to redact the payroll data.   This demonstrates that, *at trial*, Petroski understood that "financial information" includes payroll information.

The heart and essence of the instant appeal is the question whether, to Petroski, the written order was reasonably specific. The majority agrees that the order must be evaluated in light of "the audience to which it was addressed."  In the context of the civil lawsuit, that means whether, viewed reasonably from Petroski's point of view, the order should be read as including payroll statistics as part of the prohibited mention of "financial status."  I do not understand how, in light of Petroski's above-quoted statements, anyone could conclude that, at least as to him, the order was not reasonably specific and perfectly understandable.

Nor can I agree with the majority's conclusion that an order stating that "Plaintiff is ORDERED not to present" certain matters implies, as the majority reasons, "that Keystone [the *defendant*] would not be allowed to introduce" it.  The order says what it says.  If Petroski felt that the order was one-sided, his remedy was to ask for reconsideration or to appeal the ruling, not boldly to violate that reasonably specific order.

17

In summary, this is a case in which the attorney repeatedly tested the admirable patience of the district court by introducing evidence, before the jury, that he had been warned not to introduce. Finally, he violated the specific order at issue here, and the court made good on its promise to hold him in contempt if he insisted on misbehaving.

The court's action was justifiable and fair. The finding of reasonable specificity was not clearly erroneous. The able district judge, present throughout the proceedings, was in the best position to evaluate whether the element of reasonable specificity was established beyond a reasonable doubt. That standard is easily met here. Accordingly, I respectfully dissent.